**UNITED STATES of America, Plaintiff–Appellee,**

v.

**SUNTAR ROOFING, INC.; and David Kevin Pratt, Defendants–Appellants.**

**Nos. 89–3113, 89–3114.**

United States Court of Appeals, Tenth Circuit.

Feb. 27, 1990.

Laura Heiser (James F. Rill, Asst. Atty. Gen., and Judy L. Whalley, Deputy Asst. Atty. Gen., Dept. of Justice, Washington, D.C.; Diane C. Lotko–Baker, Ann M. Gales, and Kent Brown, Dept. of Justice, Chicago, Ill., with her on the brief), for plaintiff-appellee.

J. Lawrence Louk, of Fox & Partee (Byron Neal Fox, P.C., and Ronald E. Partee, P.C., on the brief), Kansas City, Mo., for defendants-appellants.

Before LOGAN, TACHA, and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Appellants Suntar Roofing, Inc. (Suntar), and David Kevin Pratt (Pratt), president and part-owner of Suntar, appeal their convictions for unreasonably restraining inter-

state trade and commerce in violation of § 1 of the Sherman Act (15 U.S.C. § 1).

Appellants were indicted along with fellow defendants Ronan's Roofing, Inc. (Ronan's Roofing), and its president, Michael T. Ronan (Ronan). Additionally, in its bill of particulars the government identified three unindicted co-conspirators: (1) Tom Keaton (Keaton), a part-owner of Suntar and another roofing company, Keaton Brothers Roofing and Siding, Inc.; (2) Andy Boxley (Boxley), a Suntar employee during the alleged conspiracy; and (3) Samuel K. "Bud" Fleenor (Fleenor), an employee of Ronan's Roofing. At all relevant times, Suntar and Ronan's Roofing were Kansas corporations engaged in the business of constructing and installing cedar shake (shingle) roofs on single and multi-family homes in and around Kansas City, Kansas.

The indictment charged that the defendants and co-conspirators engaged in a continuing agreement, understanding and concert of action to allocate and divide among themselves customers for the construction and installation of roofs on new single and multi-family homes in the Kansas City, Kansas metropolitan area. The indictment further charged that commencing in or about June 1985 and continuing through mid–1986, the defendants and co-conspirators met to discuss prices, individual roofing projects, and the means to allocate specific customers between the two companies. The government alleged that they agreed to stop competing and refrained from competing for the business of each company's established customers.

The jury returned a verdict of not guilty as to defendants Ronan's Roofing and Ronan and a verdict of guilty as to defendants Suntar and Pratt. Appellants now challenge their convictions on the following bases: (1) that the trial judge erroneously treated the alleged activity as a "per se" violation of the Sherman Act; (2) that the jury instructions erroneously described the elements of the offense charged and that there was insufficient evidence to establish each element; (3) that the trial judge improperly admitted evidence of similar acts under Fed.R.Evid. 404(b); and (4) that the trial judge violated appellants' Sixth Amendment right to effective counsel by failing to require Suntar's counsel to withdraw because of a conflict of interest. We affirm.

## ANALYSIS

### A. Per Se Violation of the Sherman Act

Appellants contend that the trial court erred when it sustained the government's pre-trial motion to prevent the defendants from offering evidence of the reasonableness and/or economic justification for the alleged activities or evidence of the defendants' lack of intent to violate the law or to restrain trade. Thus, appellants allege that they were deprived of any opportunity to present evidence that the conduct charged was permissible under "rule of reason" analysis and that the jury was deprived of its factfinding function to determine whether the charged conduct unreasonably restrained competition.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." Generally, courts apply a "rule of reason" analysis to determine whether particular practices or conduct come within the ambit of the statute. Under "rule of reason" analysis, the factfinder weighs all of the circumstances of a case to decide whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

■ However, since the passage of the Sherman Act, the courts have formulated and applied a *per se* rule of illegality for certain restrictive practices that are deemed to be manifestly anticompetitive. *Id.* at 50, 97 S.Ct. at 2557. As the Supreme Court explained in *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and

therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Here, appellants argue that the indictment in this case did not justify the trial court's application of *per se* analysis in that the restraint charged is not clearly "pernicious" as a matter of law.

In its pre-trial motion, the government argued that the conduct charged in the indictment, a "horizontal" customer allocation agreement,[1] represented conduct which is illegal *per se*. Prior to trial, the trial court ruled that the indictment did in fact allege a *per se* violation of the Sherman Act, and that, assuming the government could present evidence establishing the violation charged in the indictment, the defendants would therefore be precluded from introducing evidence of reasonableness or justification at trial. At trial, the court concluded that the government had established the violation charged and therefore precluded defendants' additional evidence.

Consistent with the analysis of the Supreme Court and previous holdings of this court and of other circuits, we concur with the determination of the trial court and hold that the activity alleged in the indictment in this case, an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a *per se* violation of § 1 of the Sherman Act. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"); *United States v. Goodman*, 850 F.2d 1473, 1476 (11th Cir.1988) ("customer allocation agreement alone is a *per se* violation of 15 U.S.C. § 1") (citing *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1090 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133

(1978)); *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1372 (6th Cir.1988) ("customer allocation ... is the type of 'naked restraint' which triggers application of the *per se* rule of illegality"); *Mid–West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497–98 n. 2 (10th Cir.1983) ("[t]he essence of a market allocation violation ... is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers"); *United States v. Koppers Co.*, 652 F.2d 290, 293 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).

## B. The Instructions and Sufficiency of the Evidence

Appellants next challenge the court's instructions to the jury as to each element of the violation charged and contend that the government failed to present sufficient evidence to establish each element. When examining a challenge to jury instructions, we review the record as a whole to determine whether the instructions state the law that governs and provided the jury with an ample understanding of the issues and standards applicable. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988). Additionally, so long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not an abuse of discretion. *United States v. Hines*, 696 F.2d 722, 733 (10th Cir.1982).

When reviewing the sufficiency of evidence underlying a verdict in a criminal case, we must affirm if, viewing all the direct and circumstantial evidence in the light most favorable to the government, a reasonable trier of fact would find the essential elements of the crime beyond a reasonable doubt. *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–

---

1. "[A]n agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition ... is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at

different levels of the market structure, *e.g.*, manufacturers and distributors, which are termed 'vertical' restraints." *United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)).

### 1. Conspiracy

■ *a. The instructions.* Appellants first challenge the charge to the jury as to the conspiracy element of the Sherman Act violation, contending that the instructions failed to properly instruct the jury that a corporation cannot "conspire" with its owners, officers or employees. Appellants correctly point out that the law will not recognize a conspiracy when the only possible "conspirators" are a company and its employee, officer or owner, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983). Thus, in the instant case, Pratt could not be convicted of conspiracy if his only possible fellow conspirator was Suntar.

However, instruction No. 15 adequately addresses this aspect of the law concerning conspiracy. The instruction stated that "[a] conspiracy to allocate customers is an agreement or understanding *between competitors* not to compete for the business of a particular customer or customers" (emphasis added). Additionally in this case, there was no evidence suggesting to the jury that Suntar was in competition with its president and part-owner, Pratt. Insofar as appellants contend that there was insufficient evidence for the jury to find that Suntar and Pratt conspired with any of the other alleged co-conspirators (*see* section 1.b. below), instruction 15 adequately instructed the jury that they could not properly base a guilty verdict upon a "conspiracy" between Suntar and Pratt.[2]

■ Appellants also contend that the trial court failed to properly educate the jury as to what constitutes an "agreement." In instructions 15 and 17, the trial court stated:

Before the jury may find that a defendant … has become a member of a conspiracy, the evidence in a case must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the defendant knowingly participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy.

While a conspiracy involves an agreement to violate the law, it is not necessary that the persons charged meet each other and enter into an express or formal agreement, or that they stated in words or writing what the scheme was or how it was to be effected. It is sufficient to show that they tacitly came to a mutual understanding to allocate customers.

The agreement may be shown by a concert of action by members who participate with knowledge of the common purpose. Direct proof of a conspiracy may not be available, and the common purpose and plan may be disclosed only by the circumstances and acts of the members, such as their course of dealings.

These two instructions adequately set forth the law of this circuit as found in *United States v. Metropolitan Enters., Inc.*, 728 F.2d 444, 450–51 (10th Cir.1984) (citing *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975)).

■ The trial court also instructed the jury properly as to membership in the conspiracy. Instruction 18 reads as follows:

To be a member of the conspiracy a defendant need not know all of the other members, nor all of the details of the conspiracy, nor the means by which the objects were to be accomplished. Each member of the conspiracy may perform separate and distinct acts. It is necessary, however, that the Government

---

**2.** This court will not "impute to a jury the inability to understand correctly the totality of the trial court's instructions, even in a complicated case, nor will [we] impute nonfeasance, in the form of disregard of the trial court's instructions, to a jury." *Rasmussen Drilling Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

prove beyond a reasonable doubt that a defendant was aware of the common purpose, and was a willing participant, with the intent to advance the purpose of the conspiracy.

Again, this instruction properly sets forth the law of this circuit. In *Metropolitan Enters.*, we stated, "[t]he evidence must show circumstances to warrant a jury finding that the conspirators had a unity of purpose or a common design and understanding." 728 F.2d at 450–51 (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)).

Finally, in instruction No. 20 the court instructed the jury as to the absence of a conspiracy under certain circumstances:

In the absence of an agreement on a course of action that is designed to eliminate competition, it is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or discuss common aims or objectives or exchange information on independently derived prices.

Although this last instruction was not required (given the scope of the other five instructions), it certainly addressed appellants' concerns that the jury be instructed that "mere conversation" and "guilt by association" do not sustain a finding of conspiracy and that the conspirators must have a "meeting of minds."

We conclude the court's instructions adequately state the law of conspiracy and agreement. Accordingly, we cannot say that the trial court abused its discretion by failing to give any particular instruction suggested by appellant.

■ b. *The evidence.* Appellants also assert that there is insufficient evidence to support a finding of a conspiracy to allocate customers. Appellants specifically contend that since Suntar cannot legally conspire with its own president, the guilty verdicts against Suntar and Pratt are fatally inconsistent with the acquittals of appellants' only other co-defendants, Ronan's Roofing and Ronan. Additionally, appellants contend that the evidence "indicates that neither Pratt nor Suntar ... had the necessary meeting of the minds with anyone from Ronan's Roofing."

On appellants' motion for judgment of acquittal or for a new trial, 709 F.Supp. 1526, the trial court concluded that "inconsistent verdicts" is no longer a viable attack on a conviction in the wake of *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The *Powell* decision reaffirmed the general rule that consistency in verdicts is not required. *Id.* at 62, 105 S.Ct. at 475; *see also Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). Before *Powell*, the courts recognized a traditional exception to this general rule when a single conspirator is convicted in the same proceeding or prosecution in which all her alleged co-conspirators are acquitted. *Hartzel v. United States*, 322 U.S. 680, 682 n. 3, 64 S.Ct. 1233, 1234 n. 3, 88 L.Ed. 1534 (1944); *United States v. Howard,* 751 F.2d 336, 338 (10th Cir.1984), *cert. denied,* 472 U.S. 1030, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985); *Romontio v. United States,* 400 F.2d 618, 619 (10th Cir.1968), *cert. dismissed,* 402 U.S. 903, 91 S.Ct. 1384, 28 L.Ed.2d 644 (1971).

Concluding that the traditional exception is no longer viable after *Powell*, the trial court "decline[d] to apply the traditional exception to set aside the convictions of Suntar and Pratt." Unfortunately, the trial court's conclusion is substantially undercut by the fact that the *Powell* opinion does not discuss *Hartzel* or expressly overturn the traditionally recognized exception.[3]

However, the facts of this case do not demand the resolution of any conflict be-

---

**3.** Two other circuits have reached this issue and come to the same conclusion as did the trial court. *See United States v. Andrews,* 850 F.2d 1557, 1561 (11th Cir.1988) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); *United States v. Valles–Valencia,* 823 F.2d 381, 383 (9th Cir.), *modifying,* 811 F.2d 1232 (1987). The Eleventh Circuit chose to distinguish *Hartzel* rather than assume *Powell* had overruled it—an approach sharply disputed by the decision's dissenters. The Ninth Circuit failed to mention *Hartzel.*

tween *Powell* and *Hartzel*. Either analysis yields the same result. In line with *Hartzel*, this court has consistently held that a defendant's conspiracy conviction must be reversed only where *all the alleged co-conspirators* are acquitted. *Howard*, 751 F.2d at 338; *Romontio*, 400 F.2d at 619. Here, the government identified three unindicted co-conspirators in addition to the four indicted co-conspirators. The jury could have found the existence of a conspiracy involving one or more of the unindicted co-conspirators. Under the law of *Howard* and *Romontio*, appellants' convictions will stand if there is sufficient evidence in the record from which the jury could have concluded that a conspiracy existed between the appellants and any of the unindicted conspirators.

The three unindicted co-conspirators were Boxley, Fleenor and Keaton. Boxley, of course, was only an employee of Suntar and hence his participation could not support a conspiracy conviction of his employer. Keaton was a part owner of Suntar, but also was part owner of a competitor roofing contractor. *See infra*, at 480 n. 5. For purposes of our review and discussion, the evidence in the record points to Fleenor as the most likely co-conspirator of Pratt and Suntar. Indeed, there is sufficient evidence in the record from which the jury could conclude that Bud Fleenor met with Kevin Pratt on several occasions to discuss ending the price war between the two roofing companies and that he in fact reached an agreement with Pratt to allocate specific builder customers between Suntar and Ronan's Roofing.

First, Boxley testified that during summer 1985 Boxley, Pratt and Pratt's brother, Don Pratt, agreed that the 1985 "price war" between Suntar and Ronan's Roofing had gone "far enough." Boxley also testified that he called Fleenor at Ronan's Roofing to talk to him about "bringing an end to [the price war]." At that time, Fleenor refused to discuss the subject and hung up on Boxley. The next weekend, Boxley again called Fleenor, this time at Fleenor's residence, and the two agreed that "no one was winning [the price war] but the actual builders, and [Fleenor] told [Boxley] to

have [Pratt] give [Ronan] a call at the office." The next Monday, Boxley reported his conversation to Pratt and Pratt said he would get hold of Ronan. Boxley also testified that Ronan then came over to Suntar's offices and met with Pratt. After that meeting, Pratt told Boxley that "the price war [is] over, that [Pratt] and [Ronan] had reached an agreement" and that "Ronan's was going to get their builders back and that [Suntar] would be getting [their] builders back." Thereafter, Pratt and Boxley held two meetings with Fleenor in the summer of 1985: one at Suntar's office and one at Ronan's office.

Next, Fleenor testified that, as a result of the discussions between Pratt and Fleenor, it was "understood" that Pratt would begin raising his prices on Don Bell Homes, a former Ronan's Roofing customer that had recently switched some of its subcontracting work to Suntar. Shortly thereafter, Ronan's Roofing won back the Don Bell account. Fleenor also testified that he told Pratt that Ronan's Roofing would cease using three-eighths inch shakes when their current supply ran out. (Keeping three-eighths inch shakes in stock enabled Ronan's Roofing to win the business of two builders, Glanville and Rodrock, that preferred using three-eighths inch shakes to higher quality half-inch shakes. Glanville and Rodrock had previously done business with Suntar when Ronan's Roofing did not carry three-eighths inch shakes. Most of Ronan's steady customers preferred using half-inch shakes.) Shortly thereafter, Ronan's stopped using three-eighths inch shakes and Glanville and Rodrock returned their business to Suntar.

Fleenor also testified that he told Pratt that Ronan's would begin raising the price of its bids to Rechfertig Homes and Rechfertig Taulbert, builders that previously had employed Suntar but that had switched to Ronan's during the price war. Ronan's Roofing did raise its prices to Rechfertig and Rechfertig Taulbert, and both builders eventually gave their business back to Suntar.

Appellants maintain that "[i]t is inconsistent for the jury to believe that Pratt or

some other agent of Suntar conspired with Fleenor while at the same time finding that Ronan and Ronan's Roofing did not conspire with Suntar." However, appellants' argument on this point goes no further than this flat assertion. Viewing the evidence in the light most favorable to the government, we hold that there is sufficient evidence in the record from which the jury could conclude that Pratt conspired with Fleenor and that Fleenor did not have the approval of Ronan or Ronan's Roofing to engage in such activity.

In his testimony, Ronan gave his own account of his trip to Suntar's offices and of his discussion there with Pratt. Ronan testified that he never had conversations with Pratt or Boxley about ending the price war, and that he never entered an agreement with Suntar or Pratt to end the price war, split up builders or give back builders. He testified that he only visited Suntar's offices to collect a past-due bill for material sold to Suntar by Ronan's Roofing.

Ronan also testified that Fleenor told him that Suntar was willing to end the price war and that Fleenor asked Ronan what he thought. Ronan responded that there was "no way that I was going to split up any builders." Ronan testified that he did not recall having any other conversations with Fleenor regarding "end[ing] the price war." He testified that he never authorized or directed Fleenor to enter into any such agreement. Ronan also testified that Fleenor was solely responsible for sales and for bidding contracts for Ronan's Roofing and had been since 1980 or 1981. Fleenor's testimony corroborated this fact.

Therefore, we hold that there was sufficient evidence before the jury to support a finding that Suntar and Pratt had conspired with Bud Fleenor, an employee of Ronan's Roofing, to allocate builders between the two roofing companies.

### 2. Interstate commerce

■ a. *The instructions.* Appellants next contend that the trial court improperly instructed the jury on the jurisdictional prerequisite that the restraint of trade involve interstate commerce. Specifically, appellants argue that the trial court erred by failing to employ the following instruction proposed by appellant:

> If you find that a defendant's illegal activities had either no impact or only a minimal impact on interstate trade, then you must find that the defendant's activities did not involve interstate commerce, and you must find the defendant not guilty.

The trial court first instructed that the jury was required to find "[t]hat the conspiracy charged in the indictment either affected interstate commerce in goods or services or occurred within the flow of interstate commerce in goods or services." This instruction ably states the law as established in *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980):

> Although the cases demonstrate the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce.

(Citations omitted.) *See also, Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 723–24 (10th Cir.1980) ("even the purely local activity of a completely local business falls within the Act's reach if it appreciably affects a channel of commerce demonstrably interstate in character."). To further delineate the distinction between the "in commerce" and "effect on commerce" theories, the trial court instructed the jury:

> An essential element of the offense prohibited by the Sherman Antitrust Act

is that the defendants' alleged unreasonable restraint of trade must involve interstate commerce. The term "interstate commerce" includes transactions of commodities that are moving across state lines or that are in the continuous flow of commerce from the commencement of their journey until their final destination in a different state. When such transactions are involved, the amount of commerce restrained by the conspiracy is of no significance.

The term "interstate commerce" may also include entirely intrastate transactions in which some or all the defendants are not engaged in interstate commerce and some or all of the acts are wholly within a state, if the activities substantially and directly affect interstate commerce.

It is a question of fact for the jury to determine whether a particular defendant's conduct involves such interstate commerce in the light of business practices.

In our opinion, the instructions of the trial court adequately state the law of this circuit and properly put before the jury the requirements for finding "[a] nexus, assessed in practical terms, between interstate commerce and the challenged activity." *Crane,* 637 F.2d at 724.

 b. *The evidence.* Appellants also argue that the government failed to present evidence that the customer allocation agreement reduced the flow of goods in interstate commerce. However, neither the "in commerce" nor "effect on commerce" test requires the government to *quantify* the adverse impact of the challenged activity. As this court noted in *Crane:*

"There is no ... concern with the specific magnitude of the impact on interstate commerce caused by the alleged conspiracy. Instead, the Court in each case ends its inquiry when it has satisfied itself that *the logical and therefore probable effect* of the alleged act is to reduce the flow of goods in interstate commerce."

637 F.2d at 724 (quoting *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 53 (3rd Cir.1973) (footnote omitted & emphasis added)); *see also, Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975) ("in commerce" theory; so long as the challenged business activity is in commerce, "no specific magnitude need be proved"); *McLain,* 444 U.S. at 243, 100 S.Ct. at 510 ("effect" test; "jurisdiction [is not] defeated in a case relying on anticompetitive effects by plaintiff's failure to quantify the adverse impact of defendant's conduct").

The burden on the government is even less when a *per se* restraint is at issue. In *Burke v. Ford,* 389 U.S. 320, 321–22, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967) (*reversing* 377 F.2d 901 (10th Cir.1967)), the Supreme Court held that in the context of horizontal territorial market divisions (a *per se* restraint), a substantial adverse effect on interstate commerce results, as a matter of practical economics, by virtue of the restraint itself. *See Hospital Bldg. Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976); *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985); *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1085–86 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978). The *Burke* court held:

The Court of Appeals held that proof of a state-wide wholesalers' market division in the distribution of goods retailed in substantial volume within the State but produced entirely out of the State was not by itself sufficient proof of an effect on interstate commerce. We disagree. Horizontal territorial divisions almost invariably reduce competition among the participants. When competition is reduced, prices increase and unit sales decrease. The wholesalers' territorial division here almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers.

389 U.S. at 321–22, 88 S.Ct. at 444 (citations omitted).

Assuming for purposes of our review that the jury concluded that the customer allocation agreement was a purely local activity, we hold that there was sufficient evidence in the record from which the jury could infer a substantial and appreciable effect on interstate commerce. All of the cedar shakes purchased by Suntar and Ronan's Roofing were purchased from out-of-state companies. From June 1985 until 1986, Ronan's Roofing purchased approximately $400,000 worth of shakes from a company in Oregon. Suntar and Ronan's Roofing combined purchased an additional $230,000 worth of shakes during that same time period from a lumber company in Oklahoma. All of these shakes were produced in mills in either the Northwest United States or in Canada.

Additionally, the jury could draw certain inferences from the existence of the *per se* restraint itself. Although the market division here was on a smaller scale than the state-wide divisions at issue in *Burke,* the jury could still infer that the practical effect of Suntar's and Fleenor's agreement to raise prices on certain builders and Fleenor's agreement to stop purchasing three-eighths inch shakes was to decrease the purchases of both companies from their out-of-state suppliers. Given the volume of shakes purchased the preceding year, the jury could well conclude that the agreements had a substantial and appreciable effect on interstate commerce.

### C. Rule 404(b) Similar Acts Evidence

Appellants next contend that the trial court erred in ruling prior to trial that evidence of similar acts under Fed.R.Evid. 404(b)[4] was admissible and in allowing such evidence to be presented at trial. At trial, the government presented evidence concerning similar customer allocation agreements entered into by the defendants before and during the time period charged

in the indictment "to show that participation of defendants in the charged customer allocation conspiracy was part of a course of conduct and was knowing and intentional, rather than the result of accident or mistake." Appellants assert that this evidence should have been excluded for two reasons: (1) appellants' intent was not at issue because they denied that they had committed the acts charged in the indictment, and (2) the probative value of the evidence was far outweighed by its prejudicial effect.

A district court has broad discretion in determining whether to admit evidence of other crimes under 404(b), and its decision to admit such evidence will not be reversed by this court absent an abuse of discretion. *United States v. Record,* 873 F.2d 1363, 1373 (10th Cir.1989); *United States v. Cuch,* 842 F.2d 1173, 1177 (10th Cir.1988). A defendant is protected from unfair prejudice if the evidence is relevant and offered for a proper purpose, if the probative value is not substantially outweighed by its potential for unfair prejudice, and if the court, upon request, instructs the jury to consider the evidence only for the proper purpose for which it was admitted. *Huddleston v. United States,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988); *Record,* 873 F.2d at 1374. When offered to show intent, such similar acts should be reasonably similar and close in time to the offense charged. *Cuch,* 842 F.2d at 1176.

Similar acts evidence is admissible under 404(b) to prove knowledge, intent, or lack of mistake. Intent to restrain competition (here, by way of the customer allocation agreement) is an element of a criminal violation of the Sherman Act. *United States v. Metropolitan Enters., Inc.,* 728 F.2d 444, 449 (10th Cir.1984) (citing *United States v. United States Gypsum Co.,* 438 U.S. 422, 443–46, 98 S.Ct. 2864, 2876–78, 57 L.Ed.2d 854 (1978)). The requisite intent

---

4. Fed.R.Evid. 404(b) provides:
 **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

can be proved by showing that the defendants knowingly joined and participated in the conspiracy. *Id.* at 450, 98 S.Ct. at 2880. Thus, the intent of the conspirators was properly at issue during the trial.

As with all similar acts evidence, the evidence presented here to the jury carried some danger of prejudice and confusion of the issues. However, the evidence as admitted contained several of the *Huddleston* safeguards against unfair prejudice. First, the similar acts presented were reasonably similar and close in time to the offense charged.[5] Second, the trial court repeatedly instructed the jury during trial as each piece of similar acts evidence was admitted that the evidence could be considered only for the limited purpose of proving knowledge, intent, or lack of mistake, and could only be considered with respect to the particular defendants against whom it was being admitted. Third, the court's instruction No. 25 at the close of trial properly stated the text of Rule 404(b) and reminded the jury of the limited purposes for which the evidence could be used. We therefore hold that the trial court did not abuse its discretion in admitting the similar acts evidence.

### D. Conflict of Interest

■ Finally, Appellants contend that the trial court violated appellants' Sixth Amendment right to effective assistance of counsel by failing to allow Suntar's counsel to withdraw. At trial and on appeal, appellants maintain that because Byron Neal Fox (Fox) served as counsel for both Suntar and Keaton, his continued representation of Suntar at trial created a conflict of interest. (Keaton was named as an unindicted co-conspirator in the government's bill of particulars and he was a party to some of the discussions used as similar acts evidence at trial.)

■ "A court confronted with and alerted to a possible conflicts of interest must take adequate steps to ascertain whether the conflict warrants separate counsel." *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (citations omitted). While we review *de novo* the district court's determination of whether an actual conflict existed, the court's resolution of the underlying facts giving rise to its conclusion is subject to a clearly erroneous standard of review. *United States v. Soto Hernandez,* 849 F.2d 1325, 1328–29 (10th Cir.1988).

In *Soto Hernandez,* this court stated:

> The sixth amendment entitles a criminal defendant to an attorney free of interests that actually conflict with those of the accused. This right is not limited to cases involving joint representation of codefendants at a single trial, but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person. To prevail on an ineffective assistance claim of this variety 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' Once an actual conflict and an adverse effect are shown, an accused need not show prejudice to receive relief.

849 F.2d at 1328 (citations omitted).

Although the defendant raised an objection to the possible conflict just prior to trial, the court held a hearing on the issue and issued an order declining to require counsel to withdraw. The trial court "was not convinced that an actual conflict [arose] from Fox's posture" in the case, and, in its denial of appellants' motion for judgement of acquittal or for a new trial, the court observed that "the evidence at trial indicated that the interests of Keaton and Suntar were parallel, as Keaton was the part-owner of Suntar." '

---

**5.** Specifically, the evidence showed that (1) Suntar and Ronan reached an agreement in early 1985 to allocate Cowan Homes to Ronan's Roofing; (2) Suntar, through Pratt, reached customer allocation agreements with four other roofers, Larry Vaught Roofing, Russell Nugent Roofing, Keaton Bros. Roofing & Siding, Inc., and Cedarside Roofing at various times between 1982 and mid–1985; and (3) in the spring of 1986, Pratt met with another roofer, Orin Jackson, to discuss entering into a customer allocation agreement.

Although Keaton was also named individually as an unindicted co-conspirator, we fail to find any evidence in the record that contradicts the trial court's finding. Moreover, appellants have never done more than allege a *possible* conflict of interest; they have made no attempt to establish or demonstrate that an actual conflict of interest adversely affected Fox's performance at trial. Accordingly, we cannot say that the trial court's findings are clearly erroneous and we affirm the trial court's conclusion that no actual conflict existed for Suntar's attorney which violated appellants' right to effective counsel.

Appellants' convictions are AFFIRMED.