**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**ABBOTT WASHROOM SYSTEMS, INC., doing business as Abbott Fire Extinguisher Company, Defendant–Appellee.**

No. 94–1326.

United States Court of Appeals,
Tenth Circuit.

Feb. 27, 1995.

Paula M. Ray, Asst. U.S. Atty., Denver, CO (Henry L. Solano, U.S. Atty., with her on the brief), for plaintiff-appellant.

Dennis W. Hartley, Colorado Springs, CO, for defendant-appellee.

Before ANDERSON and HOLLOWAY, Circuit Judges, and DOWNES,* District Judge.

HOLLOWAY, Circuit Judge.

In January 1994 defendant-appellee Abbott Washroom Systems, Inc., d/b/a Abbott Fire Extinguisher Company (Abbott), and a vice-president of Abbott, Roy A. Chambers, were indicted on three counts charging violations of the False Claims Act, 18 U.S.C. § 287 and aiding and abetting those offenses, 18 U.S.C. § 2. The charges concerned presenting false, fictitious or fraudulent claims for services on fire extinguishers to government employees at Fort Carson, Colorado. The gist of the offenses alleged was that $CO_2$ and dry chemical fire extinguishers were stickered and stamped ("pencil-whipped") as

---

* Honorable William F. Downes, United States District Judge for the District of Wyoming, sitting by designation.

if they had been serviced properly and that billings for services not properly performed were presented for November 1991 and later for September and October 1992.

Trial was held in the district court in April 1994 and verdicts of guilty as to Abbott were returned on the three counts; not guilty verdicts were returned as to Chambers. Abbott moved for a judgment of acquittal or a new trial on May 4, 1994. On July 11, 1994, the district judge declared a mistrial, set aside the verdict, and ordered a new trial by the following order:

> This matter is before the court on defendant's "Motion for Judgement of Acquittal and Motion for New Trial." Upon consideration of the motion, response, and reply, it appears that the jury verdict in this case is inconsistent with the verdict as to Roy A. Chambers and that there is no rational explanation for the verdict. Accordingly, the court declares a mistrial, sets aside the verdict, and orders a new trial. Within ten (10) days of the date of this Order, counsel shall appear together in chambers to obtain a new trial date.

> IT IS SO ORDERED.

The government appeals pursuant to 18 U.S.C. § 3731. It asserts that the trial judge erred by granting a new trial on the basis that the verdicts as to Abbott and Chambers were inconsistent and that, contrary to Abbott's contention, there was sufficient evidence to support Abbott's convictions. Abbott responds by noting that its post-trial motion for a judgment of acquittal challenged the sufficiency of the evidence as to Abbott. Abbott recognizes that the judge granted a new trial on the basis of inconsistent verdicts, but it maintains on appeal, as in its motion below, both that there was insufficient evidence to convict Abbott and that in the circumstances of this case, the inconsistent verdicts cannot stand.

# I

We turn first to the judge's reliance on the inconsistent verdicts as the basis for his ruling. The government relies, *inter alia*, on *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), which summarized the law on inconsistent verdicts:

> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. *Harris v. Rivera*, [454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981)], indicates that nothing in the Constitution would require such a protection, and we therefore address the problem only under our supervisory powers over the federal criminal process. For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. This possibility is a premise of *Dunn*'s [284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932)] alternative rationale—that such inconsistencies often are a product of jury lenity. Thus, *Dunn* has been explained by both courts and commentators as a recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch....

> ....

> We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake....

> Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts.... The Government must

convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

. . . .

... Respondent is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted. The rule established in *Dunn v. United States* has stood without exception in this Court for 53 years. If it is to remain that way, and we think it should, the judgment of the Court of Appeals must be

Reversed.

469 U.S. at 65–69, 105 S.Ct. at 477–79.

Abbott combines its challenge to the sufficiency of the evidence with its reliance on the inconsistency of the verdicts. It contends that we should conduct our review of the sufficiency of the evidence within a framework recognizing that the jury found the evidence insufficient as to Mr. Chambers. Abbott says this is the "appropriate scope of review" and thus we "may only consider evidence offered against Abbott alone and not against Mr. Chambers." Appellee's Brief at 10. And Abbott contends that *Powell* does not apply here because Abbott and its agent Chambers were charged in the same counts, not different counts as in *Powell.*

We are not persuaded by these arguments. The difficulty of inconsistent verdicts is present here as it was in *Powell.* In *Powell* the Court noted the defendant's argument that logically the jury could not have acquitted her of conspiracy to possess the drug and possession of it and still found her guilty of using the telephone to facilitate those offenses. Nevertheless the Court firmly held "there is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled." 469 U.S. at 69, 105 S.Ct. at 479. Moreover *Powell* pointed out that in *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135–36, 88 L.Ed. 48 (1943), the general rule of *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190,

76 L.Ed. 356 (1932), that "[c]onsistency in the verdict is not necessary. . . ." was relied on to support a jury verdict finding the president and general manager of a corporation guilty of introducing adulterated or misbranded drugs into interstate commerce, but acquitting the corporation of the same charge. *Powell,* 469 U.S. at 63, 105 S.Ct. at 475–76. *Dotterweich* involved two informations, one apparently against the company and one against Dotterweich, its president and general manager. Three counts of the informations went to the jury—two for misbranded drugs and one for an adulterated drug. Dotterweich made an inconsistency argument which the Court bruskly rejected: "Equally baseless is the claim of Dotterweich that, having failed to find the corporation guilty, the jury could not find him guilty. . . . Juries may indulge in precisely such motives or vagaries. *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189]." *Dotterweich,* 320 U.S. at 279, 64 S.Ct. at 135. *See United States v. Hill,* 971 F.2d 1461, 1468–70 (10th Cir.1992) (en banc).

We do not feel that the distinction attempted by Abbott on the separate counts theory is persuasive. The thrust of the *Dunn* rule, reaffirmed in *Powell,* simply forecloses such arguments for a new trial based on inconsistency in the jury's verdicts.

In *United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 475 (10th Cir.1990), we stated "[t]he *Powell* decision reaffirmed the general rule that consistency in verdicts is not required." We noted, however, that it was unclear whether *Powell* had eliminated the "rule of consistency," previously recognized by the Court, *see, e.g., Morrison v. California,* 291 U.S. 82, 93, 54 S.Ct. 281, 286, 78 L.Ed. 664 (1934); *Gebardi v. United States,* 287 U.S. 112, 123, 53 S.Ct. 35, 38, 77 L.Ed. 206 (1932), which requires the reversal of a defendant's conspiracy conviction if all his coconspirators are acquitted of the same conspiracy charges. 897 F.2d at 475.

In *Hartzel v. United States,* 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944), the Supreme Court reversed convictions on seven counts of an indictment charging the defendant with various offenses under the Es-

pionage Act of 1917, including conspiracy. Although the Court found the evidence insufficient to support the convictions, in a footnote it stated that because the convictions of Hartzel's coconspirators had been set aside, it was "impossible to sustain [the] conviction upon the basis of ... the conspiracy count." 322 U.S. at 682 n. 3, 64 S.Ct. at 1234 n. 3. Our decision in *Romontio v. United States,* 400 F.2d 618 (10th Cir.1968), *cert. dismissed,* 402 U.S. 903, 91 S.Ct. 1384, 28 L.Ed.2d 644 (1971), reversed a defendant's conspiracy conviction because his coconspirators had been acquitted of the conspiracy charge. In so holding we noted, citing *Hartzel inter alia,* that our circuit and many other courts followed this rule of consistency. *Romontio,* 400 F.2d at 619 and 619 n. 3.

In *Suntar Roofing, supra,* we said that *Powell* did not expressly overrule *Hartzel.* 897 F.2d at 475. However, we noted that we did not have to resolve any conflict between *Powell* and *Hartzel* because the government identified unindicted coconspirators, and under our circuit precedents, *United States v. Howard,* 751 F.2d 336 (10th Cir.1984), and *Romontio,* all alleged coconspirators had to be acquitted before the rule of consistency could apply. *Suntar Roofing,* 897 F.2d at 475–76.

Similarly, in *United States v. Howard,* 966 F.2d 1362 (10th Cir.1992), we upheld a conspiracy conviction despite the fact that the codefendant was acquitted of conspiracy. We distinguished *Romontio* "because defendant was charged with conspiring not only with his codefendant but also 'with others

both known and, unknown to the Grand Jury.'" 966 F.2d at 1363. Because of the distinction, we again found it unnecessary to decide the validity of this limited rule of consistency. *Id.* at 1364. Also, in *United States v. Sasser,* 974 F.2d 1544, 1561 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993), we found no inconsistency in the verdicts and thus again declined to decide whether *Powell* abrogated our *Romontio* decision.

Nor does the instant case require us to decide whether the limited rule of consistency remains valid.[1] That rule of consistency has always been limited to conspiracy convictions and therefore is inapplicable here because the guilty verdicts against Abbott were not for conspiracy. Instead Abbott was found guilty of knowingly presenting false claims to the government and/or aiding and abetting that offense.[2] Abbott's conviction falls squarely within the general rule of *Powell* and *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). In *Standefer,* the Court upheld a conviction for aiding and abetting despite the fact that the principal had been acquitted of the substantive offense. *Standefer* and *Powell* mandate that we reinstate the guilty verdicts so long as they were supported by sufficient evidence. We therefore must examine the sufficiency of the evidence.

## II

### A

For reasons given above, we cannot agree with defendant Abbott that in judging

---

1. We note as we did in *Howard,* 966 F.2d at 1363, that the other circuits which have decided this issue have held that after *Powell* the rule of consistency is no longer law. *See United States v. Acosta,* 17 F.3d 538, 545 (2d Cir.1994); *United States v. Zuniga–Salinas,* 952 F.2d 876, 877–78 (5th Cir.1992) (en banc); *United States v. Bucuvalas,* 909 F.2d 593 (1st Cir.1990); *United States v. Thomas,* 900 F.2d 37 (4th Cir.1990); *United States v. Andrews,* 850 F.2d 1557 (11th Cir.1988) (en banc), *cert. denied,* 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); *United States v. Valles–Valencia,* 823 F.2d 381 (9th Cir. 1987); *but see Andrews,* 850 F.2d at 1571 (Clark, J., dissenting) (rule of consistency valid after *Powell* ). Other circuits indicate that *Powell* probably eliminates the rule of consistency. *See United States v. Dakins,* 872 F.2d 1061, 1065 (D.C.Cir.), *cert. denied,* 493 U.S. 966, 110 S.Ct. 410, 107 L.Ed.2d 375 (1989); *United States v.*

*Mancari,* 875 F.2d 103 (7th Cir.1989); *Government of the Virgin Islands v. Hoheb,* 777 F.2d 138, 142 n. 6 (3d Cir.1985); *see also, Hoheb,* 777 F.2d at 142–43 (Garth, J., concurring) (*Powell* and *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), undercut the rule of consistency). Again, we leave for another day the consideration of the continued validity of the limited rule of consistency.

2. No question is raised as to whether Abbott was convicted of aiding and abetting or the substantive offense. The judge instructed the jury on aiding and abetting, but the general verdicts returned did not distinguish between the principal offense and aiding and abetting. Because of *Powell* and *Standefer,* however, our decision is the same regardless.

the sufficiency of the evidence, we may only consider evidence offered against Abbott alone due to the verdict rendered in Chambers' favor. We will, however, consider Abbott's general challenge to the sufficiency of the evidence to support the conviction of Abbott on the three counts of the indictment. We will examine all of the evidence in the light most favorable to the government, together with the reasonable inferences to be drawn therefrom, to determine whether a rational juror could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Levine,* 41 F.3d 607, 610 (10th Cir.1994). Here the essential elements are that (1) the defendants knowingly made and presented to a department or agency of the United States a false, fraudulent or fictitious claim against the United States; and (2) the defendant acted with knowledge that the claim was false, fraudulent or fictitious. *United States v. Kline,* 922 F.2d 610, 611 (10th Cir.1990); *United States v. Causey,* 835 F.2d 1289, 1292 (9th Cir.1987).

Abbott makes a general challenge to the sufficiency of the evidence, with prominent emphasis on its position based on the inconsistency of the verdicts as to Chambers and Abbott. We have rejected that theory but will now consider the overall attack on the sufficiency of the evidence with our focus being on proof or lack of it on the essential elements of the offenses charged in the three counts of the indictment.

**B**

█ Count I of the indictment alleged that on or about December 2, 1991, Roy Chambers and Abbott made and presented to the Army a claim against the United States, an invoice requesting payment of $9,039.86 for services allegedly provided to the Army between October 31 and November 27, 1991,[3] knowing such claim to be false, fictitious and fraudulent in that the services had not been provided as claimed, all in violation of 18 U.S.C. §§ 287 and 2.

In response to the general attack on the sufficiency of the proof, the government points to the testimony of Ms. Eleanor Regina Edwards, an Abbott employee from 1988 until April or May 1992, when she was discharged. App. at 52. Since Edwards was discharged in the spring of 1992, her testimony deals only with count I. Specifically, Ms. Edwards testified about shortcuts that were taken on extinguishers between November and December of 1991. *Id.* at 64. She said they would get frustrated and not follow the procedures for servicing the fire extinguishers. They would nevertheless put a sticker on the extinguishers indicating that the six-year maintenance had been done, when actually it had not been performed. On extinguishers that were harder to service, Bob Greene, the former owner, had told the employees just to sticker an extinguisher and send it on to Fort Carson without doing the required work. The employees called this process "pencil-whipping." The employees would simply pencil in or stamp the date to indicate the work had been done. They would then put a sticker on the extinguisher showing that it had been serviced when in fact it had not. *Id.* at 65.

Greene began this pencil-whipping when the employees had a lot of trouble with the Kiddie extinguishers. And Chambers told the employees to keep following this procedure because they were having too much trouble with them. When the employees became swamped in the shop, they pushed the work through to get the extinguishers back to Fort Carson "to get that money on the accounts." *Id.* at 64. Edwards personally stickered an extinguisher without actually performing the required maintenance, as did other employees. *Id.* at 65–66.

Ms. Edwards described the difference in pencil-whipping the $CO_2$ extinguishers and the dry chemical extinguishers. The $CO_2$ extinguisher had to be put in a big pressure tank, while a dry chemical extinguisher did not. *Id.* at 65–66. Roy Chambers instructed Edwards to continue pencil-whipping the extinguishers, and Edwards saw employees Stevens, Noice and Perea pencil-whip extinguishers. Edwards said that pencil-whipping occurred because when she was working on extinguishers in the back along with the other employees, "we did it together." *Id.* at 66.

---

**3.** Roy and Regina Chambers took title to Abbott on November 1, 1991. *Id.* at 93.

Edwards said that in the timeframe of November and December 1991, there were days when Abbott would pick up 20, 30, 40 or 50 extinguishers at a time. *Id.* at 71–72. While Edwards expressed some uncertainty, she did testify that during the month of November there were some extinguishers that had been pencil-whipped. *Id.* at 77. In November and December of 1991, on Roy Chambers' instructions, Ms. Edwards took the billings to Brown and Clarose at Fort Carson. *Id.* at 73–75.

When Edwards was asked whether she had personal knowledge that Fort Carson was billed for extinguishers that had been pencil-whipped and not had the work done on them, she explained that the employees set the extinguishers all in a pile and sent them back. When the extinguishers were placed in a pile to be sent out, they were marked on the billing sheet as being accomplished and finished and billed for. The extinguishers were not delivered to Fort Carson unless they were billed for. *Id.* at 71.

Abbott particularly argues that there was no evidence that the company's acts were such that Abbott could be found guilty because there was a lack of proof that Abbott acted with knowledge of the fact that the claims were false, fraudulent or fictitious. Appellee's Brief at 5–6. We disagree. While there is contradictory evidence and some of Ms. Edwards' testimony was undermined on cross-examination, the credibility and weight of her testimony were for the jury. We feel that, as a whole, the record permitted the inference that the company was guilty as to count I in light of the knowledge of its part owner, Mr. Chambers, and the transactions described.

### C

Count II charged that Roy Chambers and Abbott presented a claim against the United States on or about September 30, 1992, by an invoice requesting payment of $7,454.87 for services allegedly provided to the Army between September 1 and September 29, 1992, knowing such claim to be false, fictitious and fraudulent in that the services had not been provided as claimed, all in violation of 18 U.S.C. §§ 287 and 2.

In September 1992, Charles Huggins, an employee of the Department of Defense, investigated Abbott. He received a report on September 8 that there was a chance that Abbott was not performing all required work on extinguishers. *Id.* at 95–96. The contract with Abbott provided that servicing, testing and refilling of extinguishers would be in accordance with the National Fire Protection Association Pamphlet 10. *Id.* at 97, 99.

Huggins marked some extinguishers going to Abbott so that he could tell whether they had been opened and thus whether the work had been done on them. He marked 30 extinguishers. Of those, one was a five pound $CO_2$ fixed-head extinguisher that required a hydrotest. *Id.* at 99. Each of the dry chemical extinguishers needed at least a six-year maintenance and one needed a hydrotest. Huggins used a fluorescent paste around the threads of the head where the head screws into the neck of the cylinder. *Id.* at 100. Huggins did this because to perform a hydrotest or a six-year maintenance, the head has to be removed and cleaned; that way Huggins could tell when the extinguisher came back whether there was still paste on the extinguisher. Huggins checked under a black light to see whether the paste was present. *Id.* at 100.

Huggins testified that Exhibit 3–I was a five pound fixed-head extinguisher which he marked on October 1. It was returned to Fort Carson and had not been opened. This extinguisher had been selected because it had a rattle, indicating something was apparently loose inside it. At trial, the extinguisher still had the rattle. *Id.* at 100–01. On September 25, 1992, Huggins had marked 16 extinguishers in the manner he had described and put them with others that were to be picked up by Abbott. Mike Perea and Troy Bloom picked up the extinguishers that day. *Id.* at 102.

On September 29, Huggins saw Perea make a delivery of extinguishers. As soon as Perea left, Huggins recovered all of the extinguishers Perea had delivered. Eight of them were extinguishers that Huggins had previously marked. *Id.* at 103. Huggins

took these extinguishers into the workroom where he put them under the black light and found that three of the eight had not been opened. There were also three two-and-one-half pound dry chemical extinguishers which came back that still had the paste on them and had not been opened. These all required a six-year maintenance, which required that the head be removed.

Exhibits 3–A through 3–C were three dry chemical extinguishers that came back on the 29th of September, which had not been opened. *Id.* at 105. Exhibit 3–A required a six-year maintenance with the head removed; it came back on September 29 and had not been opened. *Id.* at 104–05. Exhibit 3–B needed a six-year maintenance and the extinguisher was affixed with a sticker saying a six-year maintenance was accomplished during September 1992 by Abbott. However, it came back on September 29 and had not been opened. Exhibit 3–C came back on September 29 and it had not been opened. It had a sticker indicating that a six-year maintenance was done by Abbott during September 1992. *Id.* at 106–07.

The government presented testimony by Troy Bloom, an employee of Abbott under Roy Chambers. *Id.* at 173. While at Abbott, Bloom said he recharged, refilled and did maintenance and repair of dry chemical extinguishers. *Id.* at 174. He testified that to do a six-year or 12–year maintenance, the head on the cylinders had to be actually broken, which meant screwing off the top of the cylinder head. *Id.* at 175. He said that he did not always properly service fire extinguishers for Fort Carson while working at Abbott. Instead, Bloom remembered Chambers saying that if you could look at an extinguisher and it looked "okay," he could put a sticker on it and send it back without breaking the head or fixing it. Bloom did this on maybe a dozen extinguishers in September or October 1992. *Id.* at 176–77. Bloom did not recall seeing anyone else at Abbott stamp an extinguisher without doing the proper service. *Id.* at 178. Bloom gave a statement to Roy Chambers' attorney which was untruthful. This was because he had not done the work on the extinguishers which he was supposed to do. *Id.* at 179.

He was told by Roy Chambers not to do the work. *Id.* at 180.

Again there were contradictions and uncertainties developed in Bloom's testimony which were revealed during cross-examination. Nevertheless, as to count II, we are again satisfied that the record evidence as a whole, taken in the light most favorable to the government, supports the jury's verdict of guilt on count II.

## D

Count III charged that Chambers and Abbott made and presented to the Army a claim against the United States, to wit: an Abbott invoice requesting payment of $9,949.43 for services allegedly provided to the Army between October 1 and October 29, 1992, knowing such claim to be false, fictitious and fraudulent in that the services had not been provided as claimed, all in violation of 18 U.S.C. §§ 287 and 2.

On October 5, 1992, Huggins again went down to Fort Carson. He marked two more extinguishers, one five pound $CO_2$ and one ten pound dry chemical extinguisher. He set them out with others for pick up and that day Mr. Chambers made the delivery and picked the extinguishers up. *Id.* at 117–18. After Chambers left the premises, Huggins recovered five extinguishers that had previously been marked. Of these, three appeared to Huggins to have been opened and worked on. However, two of the extinguishers had not been opened. *Id.* at 118. One was a ten pound dry chemical extinguisher that Huggins had submitted on October 1, and the other was a five pound fixed-head $CO_2$ extinguisher also submitted on October 1. This $CO_2$ extinguisher was the one that had the rattle. *Id.* at 118. Huggins determined that three extinguishers appeared to have been worked on by observing the threads of the head that had been wrapped with tape before being inserted in the cylinder.

Huggins said that one five pound fixed-head $CO_2$ extinguisher that appeared unopened was put under the black light and the fluorescent paste was still on the threads near the neck and it did not have the teflon

tape. *Id.* at 118–19. Exhibit 3–I was the five pound fixed-head extinguisher that he described with the rattle, and it still had paste on the threads. That Exhibit 3–I was admitted in evidence. *Id.* at 119. Exhibit 3–J was the ten pound dry chemical extinguisher which Huggins had submitted on October 1 and was returned on October 5, and it too was received in evidence. *Id.* at 119. The paste on the head and the cylinder was still in place on that extinguisher. It had no sticker to indicate that either six-year or hydrostatic testing was done. *Id.* at 119–20.

Huggins went down to Fort Carson on October 7, 1992, and marked four extinguishers, two five pound fixed-head $CO_2$s and two two-and-one-half pound dry chemical extinguishers. These were set out for collection with the rest of the extinguishers but were not picked up on October 7. On October 8, they were placed out for collection and Mr. Chambers and Troy Bloom made a delivery and picked up all of the extinguishers. After they left, Huggins checked and all of the extinguishers were gone.

On October 8, Huggins took possession of all the extinguishers that had been delivered and he separated out those which he had marked, which were three that day. He examined these under the black light, and one, a ten pound dry chemical extinguisher, no longer had the fluorescent paste and thus appeared to have been opened and serviced. However, a two-and-one-half pound dry chemical extinguisher and a five pound fixed-head $CO_2$ extinguisher appeared not to have been opened. Huggins examined Exhibit 3–K, which he said was a two-and-one-half pound dry chemical extinguisher that he had marked on September 25 and which was returned to Fort Carson on October 8. *Id.* at 121. Exhibit 3–K had a sticker indicating that a hydrotest was performed by Abbott during October 1992. This was one of the extinguishers that came back with fluorescent paste on the neck. *Id.* at 121–22.

Huggins also identified Exhibit 3–L, a five pound fixed-head $CO_2$ extinguisher submitted to Abbott on October 5 and returned by Abbott on October 8. It was examined under the black light and the fluorescent paste was still on the threads and it had no teflon

tape. It had been stamped as if the hydrostatic test was done during October 1992. *Id.* at 122.

Huggins was down at Fort Carson again on October 13, 1992. Huggins identified Exhibit 3–O as a two-and-one-half pound dry chemical extinguisher he marked on October 1, which was returned to Fort Carson on October 13, 1992. Huggins examined this extinguisher under the light and the fluorescent paste was visible. There was a sticker on the extinguisher indicating that a six-year maintenance was performed by Abbott during the month of October 1992. *Id.* at 125–26.

On October 19, 1992, Huggins went down to Fort Carson again. Bloom made the delivery that day. After he left, Huggins recovered the extinguishers that were delivered to Fort Carson. There were three that had previously been marked, two five pound fixed-head $CO_2$ extinguishers and one two-and-one-half pound dry chemical extinguisher. Exhibit 3–P was identified by Huggins as a five pound fixed-head $CO_2$ extinguisher returned to Fort Carson on October 19. It was examined under the light and Huggins observed that the paste was still on the threads and the teflon tape was not there. However, it had not been stamped as having received a hydrostatic test. Likewise, Exhibit 3–Q was a five pound $CO_2$ extinguisher that still had the fluorescent paste but no teflon tape, and it had not been stamped as if it received a hydrotest. *Id.* at 127–28. However, Huggins testified that Exhibit 3–R was a two-and-one-half pound dry chemical extinguisher returned to Fort Carson on October 19. It was examined and the fluorescent paste was still there but it had a sticker indicating that a six-year maintenance was performed by Abbott during the month of October 1992. *Id.* at 128–29.

Huggins testified that on October 22, Exhibit 3–S, a five pound fixed-head $CO_2$ extinguisher, was .returned to Fort Carson. It was examined under the light and the fluorescent paste could be seen on the threads and the tape was gone. This one was marked as if the extinguisher had received a hydrostatic test during October 1992.

Huggins summarized his findings. In the October period there were five fixed-head $CO_2$ extinguishers that came back on October 1 which Huggins had not marked and which appeared not to have been opened. He found seven fixed-head five pound $CO_2$s that had been marked which had not been opened. There were six two-and-one-half pound dry chemical extinguishers Huggins had marked which he found not to have been opened, and there was one ten pound dry chemical extinguisher Huggins had marked which he found was unopened. *Id.* at 130. Huggins identified checks to Abbott dated December 14, 1991, for $7,662.46 for the November 1991 invoice; one dated October 8, 1992, for $7,380.92 for the September 1992 invoice; and one dated November 6, 1992, for $9,849.94 for the October 1992 invoice.

We are satisfied that the evidence as to count III, taken in the light most favorable to the government, amply supports the verdict of guilty against Abbott. We therefore reject that remaining challenge to the sufficiency of the evidence, which we find adequate to support the guilty verdicts on all three counts against Abbott.

### III

The defendant-appellant Abbott argues that the proper course for the trial judge would have been to grant its motion for a judgment of acquittal on the basis of insufficiency of the evidence, rather than ordering a new trial. Appellee's Brief at 5, 11. As we have explained, we reject both arguments made by Abbott, those based on inconsistent verdicts, and those asserting insufficiency of the evidence. We find no error in the record due to the divergence between the verdicts as to Chambers and Abbott, and we hold that the evidence was sufficient to support the guilty verdicts against Abbott on all three counts of the indictment.

Accordingly, we **REVERSE** the order declaring a mistrial, setting aside the verdicts and ordering a new trial. The case is **REMANDED** with directions that the guilty verdicts against Abbott on the three counts be reinstated and that the district court pro-

ceed with the imposition of convictions and sentences on the three counts.