UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

**Filed 12/15/95**

---

UNITED STATES OF AMERICA,      )
                                      )
      Plaintiff-Appellant,   )
                                        )  Nos. 95-8006
  v.                            )  and 95-8019
                                        )  (D.C. No. 94CR-31)
DELTON OWEN OLSON,         )  (D. Wyoming)
                                      )
      Defendant-Appellee    )

---

ORDER AND JUDGMENT[*]

---

Before BALDOCK, McWILLIAMS, REAVLEY[**], Circuit Judges.

---

Delton Owen Olson was convicted by a jury of conspiracy to launder money. He was acquitted of wire fraud. Because of Olson's minimal participation in the investment scheme, the district court granted his motion for downward departure and sentenced him to 51 months imprisonment. We affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

[**] The Honorable Thomas M. Reavley, United States Court of Appeals, Fifth Circuit, sitting by designation.

Olson was charged in a multi-count indictment with Grady Hand[1] and the Cross brothers -- Stewart and Stephen. The investment scheme undertaken by the conspirators involved NorthStar Investment Trust, its successor company SLM, and Cross & Associates. Olson and Stephen Cross were the manager and trustee, respectively, for NorthStar.

In March of 1993, Olson and Stephen began marketing a "roll program" through NorthStar to investors. This program was said to provide small investors with the opportunity to invest or "piggyback" into the larger "roll program" being conducted by Cross & Associates, a company comprised of Hand and Stewart. The investors were informed that Hand and Stewart were purchasing prime bank notes in the amount of 100 to 300 million dollars or more. Cross & Associates, through its trader, was supposed to purchase the notes at a discount from only the world's largest 100 banks. Cross & Associates would then contract with an institution in the secondary market to purchase these notes. This secondary market was described as pension funds, insurance companies, and large corporations. The actual "roll" or "tranche" was supposed to occur when Cross & Associates purchased the note from the bank with cash and then sold the note to the secondary market. The difference between the purchase and sale of these instruments was to result in a substantial profit to Cross & Associates and their investors. The investors were

---

[1] Grady Lewis Hand has filed a related opinion, No. 95-8007.

informed that because of bank and federal regulations the two parties were not able to deal directly with the other, thus creating the need for Cross & Associates. There was, in fact, no roll program.

Olson brought in the first investors, a divorced couple who still invested together, in March of 1993. The couple invested $500,000 each. Investors were paid the two to 4 per cent per month return from their investment principal. The four conspirators looted much of the remaining money. In October of 1993 the investment scheme was ended by federal officials. In the end, Olson had personally taken a total of $326,000 of the investors' 3.3 million dollars.

## I. Sufficiency of the Evidence

Olson challenges the sufficiency of the evidence to support his conviction. He argues that the evidence does not establish that there was an agreement between the alleged co-conspirators to launder money or that money laundering occurred. We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could find Olson guilty beyond a reasonable doubt. United States v. Hanson, 41 F.3d 580, 582 (10th Cir. 1994).

Olson was charged with conspiracy to violate 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). Those sections provide:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
>      \*     \*     \*
>
> (B) knowing that the transaction is designed in whole or in part--
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

The "specified unlawful activity" alleged in the indictment was mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## A. The Conspiracy

The government proceeded under the basic theory that Olson and others conspired to violate § 1956(a)(1)(A)(i) or (B)(i).  18 U.S.C. § 1956(h).  To prove a conspiracy, the government must prove: (1) the existence of an agreement; (2) to break the law; (3) an overt act; (4) in furtherance of the conspiracy's object; and (5) that a defendant willfully entered the conspiracy. Hanson, 41 F.3d at 582; 18 U.S.C. § 371.  "While all five of these elements must be present, the essence of any conspiracy is 'the agreement or confederation to commit a crime.'" Id. (quoting United States v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947)).  "The agreement need not be shown to have been explicit.  It can instead be inferred from the facts and circumstances of the case." Iannelli v. United States, 420 U.S. 770, 777, n. 10, 95 S.Ct. 1284, 1289-90, n. 10, 43 L.Ed.2d 616 (1975)

4

Olson's defense and his contention on appeal is that he was unaware of the fraud being perpetrated by Cross & Associates. He insists that there is no evidence of any agreement between him and any of the other co-conspirators. The government relied on circumstantial evidence to establish the agreement between the conspirators. In support of his argument, Olson notes that Stewart Cross never informed him that the "roll program" did not exist, that he received false reports concerning investor profits in the "roll program," that he did not have access to or control over investor funds at any time, and that he did everything in his power to assure investor monies were secure. Our inquiry is not whether the Cross brothers knew Olson was aware of the object of the conspiracy, but whether Olson knew of the object of the conspiracy and voluntarily chose to participate in it. See United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992), cert. denied, 113 S.Ct. 1288 (1993) ("A defendant may be convicted of conspiracy only if the government proves that the defendant had knowledge of the conspiracy and voluntarily participated therein."); United States v. Metropolitan Enters., 728 F.2d 444, 451 (10th Cir. 1984) ("A co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy.") Olson's actions and statements to others indicate that Olson knew the roll program did not exist and chose to participate in the overall objective of the conspiracy.

5

Olson began marketing the fictitious "roll program" in March of 1993. In that month he received the program's first investment of 1 million dollars, $500,000 each from the divorced couple. In April of 1993 the couple received their first interest check of 3½ per cent or $17,500 each. Also in April the Securities and Exchange Commission inquired of Olson about NorthStar's securities activities. In an effort to avoid detection, Olson and Stephen Cross created a new entity called SLM. To further eliminate NorthStar's existence, Olson replicated NorthStar's investor management agreements with SLM as the new investment company. Olson created and sent a new agreement to each investor. The new agreements were signed by Olson using a rubber stamp of Stephen Cross's signature. The investors were then asked to sign the "new" agreements and return the old NorthStar agreements. One could easily surmise this last request was to eliminate any trace of NorthStar.

Olson met with an attorney in April to discuss the S.E.C. letter. As a result of this meeting, Olson responded to the S.E.C. in June of 1993. In that letter Olson specifically stated that "[t]here is not now nor has there been any agreement between the trust and any entity for the promotion and sale of any investment program, including a roll program." The letter also noted that all NorthStar activity had ceased. It noted, "[t]here will be no further activity in this area by the trust and the trust has had no other contact with any other potential participant for the purchase and sale of prime bank obligations."

Further, Olson related to the S.E.C. that "[a]t no time has there ever been any person or persons that have invested in [NorthStar]." Contrary to his letter to the S.E.C., Olson was still marketing a "roll program" through SLM. In a letter to an investor in September of 1993, Olson wrote, "I am pleased to inform you that we have further strengthened our piggybacking program with Cross & Associates. To simplify the mechanics and to insure our longevity with Cross & Associates, we're now piggybacking on Cross' large trading account at Paine-Webber."

Olson also made numerous false representations to investors concerning the program. Olson represented that he had seen several accounts during his time at Anovest, the brokerage company that controlled investor funds through Paine-Webber, in excess of three million dollars. He assured investors that he had personally seen trading confirmations. When one investor questioned Olson about possible S.E.C. implications, Olson replied that "[w]e have a ruling, you know, from an attorney or an opinion from an attorney stating that this does not fall within the realm of the S.E.C.; therefore, it does not need to be regulated through the S.E.C."

During the month of April, Olson was aware that investors were receiving interest checks for their investment through NorthStar. Olson's attorney testified that Olson informed him in April there was no roll program in existence. Contrary to this knowledge that the program did not exist, Olson continued to promote, profit, and participate in the scheme during and after

7

the month of April.  A rational jury could conclude from this evidence that Olson had joined the conspiracy and had agreed to continue to market the nonexistent "roll program."

### B. Money Laundering

Olson also contends that the money he gained from the illegal activity was spent personally, and therefore, does not constitute money laundering.  While he did use some of the money for himself, that is not the whole story.  Much of the money Olson received from NorthStar was spent to further promote NorthStar or SLM.  In fact, Olson himself testified that some of the money he received was spent to pay the business expenses of NorthStar whose only apparent business was to promote the "roll program."  Additionally, Olson used investor funds to pay other brokers who brought investors into the program.  A total of $54,920 was paid to these intermediate brokers.[2]  The evidence is sufficient to support a jury's conclusion that Olson used investor money obtained illegally through wire fraud to continue to "promote" the ongoing scheme.  See 18 U.S.C. § 1956(a)(1)(A)(i).

### C. Acquittal on Wire Fraud

Olson also argues that because the jury found him not guilty of wire fraud, the evidence is insufficient to support the conspiracy charge.  Even assuming that the verdicts are

---

[2]    The evidence indicates that much more money was supposed to be paid to the other brokers, but, unbeknownst to the other co-conspirators Olson kept the difference.

8

inconsistent, Olson may not challenge the propriety of his conspiracy conviction with the jury's action in the wire fraud count. See United States v. Powell, 469 U.S. 57, 66, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) ("The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable."); United States v. Abbott Washroom Systems, Inc., 49 F.3d 619, 622 (10th Cir. 1995) (a corporate defendant cannot use acquittal of employee co-defendant to challenge the corporate defendant's conviction.) [3]

## II. The Decrease in Olson's Sentence

The government contends in a cross-appeal that the district court improperly granted Olson a four-level decrease for "minimal participation" in his adjusted offense level under the Sentencing Guidelines. See U.S.S.G. § 3B1.2(a). "A trial court' findings concerning a defendant's role in a particular offense are treated by an appellate court as factual findings, which are subject to deferential review under the clearly erroneous standard." United States v. Santistevan, 39 F.3d 250, 253 (10th Cir. 1994). The finding will not be disturbed unless it is without factual support in the record, or if after reviewing the evidence we are left with a definite and firm conviction that a mistake has been made. Santistevan, 39 F.3d at 253-254. Application note one to

---

[3] This does not call into question the limited rule of consistency that is applied to where all co-conspirators are acquitted but one. See Abbott Washroom Systems, Inc., 49 F.3d at 622-623.

9

section 3B1.2 states that the mitigating circumstance for minimal participation

> is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant.

In determining Olson was only a minimal participant in the overall conspiracy, the district court noted,

> I find that there was a great deal that [Olson] was not aware of in this matter. And had he been aware, I would be speculating on what might have happened. We don't know is the point. And it seems unfair to me to, in effect, charge him with things -- with activities that clearly were kept from him and were not disclosed and were significant in terms of this operation from the very beginning because it was within a day or two of the [couple's investment of one million dollars] -- around March 31, 1993 of [their] investment that those funds were slipping away through loan transactions with [Hand] that [Olson was] not aware of and through loans, dunning (sic) loans to Stephen and to Cross & Associates.

The district court's ruling that Olson was plainly among the least culpable of the conspirators is not clearly erroneous. The court's ruling is supported by the actions of his co-conspirators in their acquisition of investor funds without Olson's knowledge and their apparent attempt to keep much of the details of the scam from Olson.

In March of 1993, Hand and the Cross brothers decided to "borrow" $300,000 of the divorced couple's investment funds from their brokerage account. The three conspirators agreed to classify this transaction as a loan. As the months passed more money would be "borrowed" from investor funds. Investor funds

10

were controlled by Cross & Associates in Atlanta, and investor statements were prepared and mailed from Cross & Associates in Atlanta. The conspirators in Atlanta perhaps attempted, although unsuccessfully, to keep Olson from discovering that the "roll program" was a ruse. Hand and the Cross brothers all misinformed Olson to further the investment scheme. While Olson was aware the program was non-existent and participated in its overall objectives, thus making him a member of the conspiracy, the district court did not clearly err in determining Olson was a minimal participant because of the actions of his co-conspirators.

AFFIRMED.

Entered for the Court

Thomas M. Reavley
Circuit Judge