<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant.

v.

KEMP & ASSOCIATES, INC.; DANIEL
J. MANNIX,

    Defendants - Appellees.

No. 17-4148

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CR-00403-DS-1)**
_____

Andrew C. Finch, Principal Deputy Assistant Attorney General, Antitrust Division
(Makan Delrahim, Assistant Attorney General, Marvin N. Price Jr., Acting Deputy
Assistant Attorney General, Kalina M. Tulley, Robert M. Jacobs, Ruben Martinez, Jr.,
Molly A. Kelley, Kristen C. Limarzi, James J. Fredricks, Adam D. Chandler, Jonathan H.
Lasken, Attorneys, with him on the briefs), Department of Justice, Washington, DC,
appearing for appellant.

James A. Mitchell (Mark R. Gaylord, Jason D. Boren, Ballard Spahr LLP, Salt Lake City,
Utah, and Michael J. Grudberg, Tarter Krinsky & Drogin LLP, New York, New York,
with him on the briefs), Ballard Spahr LLP, New York, New York appearing for appellee
Kemp & Associates, Inc.

Richard F. Albert (Devin M. Cain with him on the briefs), Morvillo Abramowitz Grand
Iason & Anello, P.C., New York, New York appearing for appellee Daniel J. Mannix.

_____

Before **PHILLIPS**, **EBEL**, and **MORITZ**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

It is axiomatic that federal courts are courts of limited jurisdiction. See, e.g., Dutcher v. Matheson, 733 F.3d 980, 984 (10th Cir. 2013). Bounded first by the strictures of Article III and further by the limits of statutory jurisdiction given to us by Congress, we are powerless to rule on even meritorious questions that lie beyond our purview.

This appeal presents a clean lesson in the import of such jurisdictional restraint. Of the two questions presented for our review, the first—whether the district court correctly dismissed the criminal indictment at issue as falling outside the applicable statute of limitations—lies cleanly within our jurisdiction granted by 18 U.S.C. § 3731. The second, however, is more complex. That question—whether the district court erred in ruling that the criminal antitrust trial contemplated by this indictment would proceed according to a rule of reason analysis rather than under the per se rule—does not fall within § 3731, which closely guards the circumstances under which the government may appeal a district court's rulings in a criminal case.

Therefore, while we hold that the indictment here was timely, we also find that we do not have jurisdiction over the district court's rule of reason order, and that mandamus is inappropriate in this circumstance. Therefore we REVERSE the district court's dismissal of the indictment, DISMISS the government's appeal from the rule

2

of reason order for lack of appellate jurisdiction and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

In reviewing the district court's decision to dismiss the indictment on statute of limitations grounds, "[w]e test the indictment solely on the basis of the allegations made on its face, and such allegations are to be taken as true." United States v. Reitmeyer, 356 F.3d 1313, 1316–17 (10th Cir. 2004) (internal quotation omitted).

On August 17, 2016, a federal grand jury in Utah returned a single count indictment against Kemp & Associates, Inc. ("Kemp") and its Vice President/COO Daniel Mannix (collectively, "Defendants") for knowingly entering into a combination and conspiracy in violation of the Sherman Act. Aplt. App. 16–21 ("Indictment") ¶¶1, 2, 8–10. Kemp is an "Heir Location Service," a term used to describe companies that "identify heirs to estates of intestate decedents and, in exchange for a contingency fee, develop evidence and prove heirs' claims to an inheritance in probate court." Id. ¶ 6.

While many intestate estates become the subject of only a single Heir Location Service inquiry, sometimes more than one Heir Location Service begins searching for the same heirs. In such cases, it is possible that a single potential heir will be contacted by, and receive offers from, more than one competing Heir Location Service. When that happens, the services may "distinguish their offers from those of competitors by offering more attractive contingency fee rates." Id. ¶ 7. In this way, while a niche community, the Heir Location Services industry operates just like any

3

other. When a single firm is vying for a potential client's business, the bounds of its offer are determined only by the price the customer is willing to pay for the service. But where more than one firm seeks a single client's business, then supply, in addition to demand, influences the price ultimately paid by the customer.

In this criminal case the Government alleges that at some point before January 29, 2014, Defendants "knowingly entered into and engaged in a combination and conspiracy with Richard A. Blake, Jr., [a competitor Heir Location Service] and other unindicted co-conspirators to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States." Id. ¶ 9. Under this agreement, when the two companies both contacted a potential heir, "the co-conspirator company that first contacted that heir would be allocated certain remaining heirs to that estate who had yet to sign a contract with an Heir Location Services provider." Id. ¶ 12(b). In return, the company to which heirs were allocated "would pay to the other co-conspirator company a portion of the contingency fees ultimately collected from those allocated heirs." Id. ¶ 11(c). The Government alleges that, in furtherance of this scheme, Defendants "made payments to the co-conspirator company, and received payments from the co-conspirator company, in order to effectuate this agreement." Id. ¶ 11(f). Based on an email from Mannix to other Kemp employees, Defendants claim that any "formal" agreement between the alleged co-conspirators ended sometime before July 30, 2008. Aplt. App. at 219.

In front of the district court, Defendants moved for an order that the antitrust case would proceed pursuant to the rule of reason, as opposed to the per se rule, and

4

to dismiss the indictment. As to the former, the Defendants acknowledged that customer allocation agreements are generally analyzed under the per se rule, but nonetheless they argued that "in the atypical context of the heir location business the [agreement] is far from an ordinary customer allocation, and instead bears more in common with joint ventures analyzed under the rule of reason[.]" Id. at 167.

As to the statute of limitations, Defendants noted that the limitations period for criminal violations of the Sherman Act is five years, and they argued that the indictment was thus untimely because any agreement between the alleged co-conspirators ended prior to Mannix's email in July of 2008, whereas the charging Indictment wasn't returned until August 17, 2016, and served on defendants on September 1, 2016. Defendants did acknowledge, however, that "for some of the estates subject to the [agreement], certain administration work continued into the five-year period prior to the Indictment, including the recovery of money for heirs, and the payment of the firms themselves." Aplt. App. at 194. Mr. Mannix's counsel echoed this language at oral argument, and went even further to note that the two firms made payments to each other as contemplated by the agreement within the statutory period.

The district court held a hearing on the two motions, and at the conclusion orally granted Defendants' motion for the case to be subject to the rule of reason. The Government subsequently filed a motion to reconsider, as well as a request for a ruling on the motion to dismiss. After that motion was fully briefed, the court issued the rulings relevant on appeal.

First, the district court adopted without edit Defendants' proposed order regarding the rule of reason. Aplt. App. at 133–36 ("the rule of reason order"). The court also simultaneously issued a longer memorandum decision and order that briefly referenced its rule of reason order, but primarily granted Defendants' motion to dismiss on the grounds that the alleged agreement ended in 2008, and so the 2016 indictment fell outside the five-year limitations window. Aplt. App. at 137–43 ("Dist. Ct. Order") at 3.

The Government timely appealed both orders. Recognizing that our appellate jurisdiction was questionable as to the rule of reason order, the government asked that if we determine we do not have appellate jurisdiction over that order that we "treat the relevant parts of [its] brief as a petition for a writ of mandamus." Aplt. Br. at 12.

## II. DISCUSSION

### A. *Statute of Limitations*

We turn first to the district court's order dismissing the indictment as barred by the statute of limitations.

The single charge in this indictment, charging a violation of 15 U.S.C. § 1, is subject to a five-year statute of limitations. See 18 U.S.C. § 3282(a); United States v. Evans & Assocs. Const. Co., 839 F.2d 656, 661 (10th Cir. 1988). A Sherman Act conspiracy, such as the one alleged here, remains actionable "until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in overt acts designed to accomplish its objectives." United

6

States v. Inryco, Inc., 642 F.2d 290, 293 (9th Cir. 1981) (citing United States v. Kissel, 218 U.S. 601, 607 (1910)).  By way of example, if several construction companies unlawfully conspire to rig the bidding process on a series of construction projects, the conspiracy does not end when the last bid is submitted.  Instead the statute of limitations is tolled as long as the firm that ultimately received the rigged bid receives payments on the unlawfully obtained contract.  Evans, 839 F.2d at 661. The "crucial question . . . is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." Grunewald v. United States, 353 U.S. 391, 397 (1957).

When reviewing the scope of the conspiracy at the Motion to Dismiss stage we are bound by the language of the indictment.  United States v. Qayyum, 451 F.3d 1214, 1218 (10th Cir. 2006).  "We test the indictment solely on the basis of the allegations made on its face, and such allegations are to be taken as true."  Id. (quoting United States v. Reitmeyer, 356 F.3d 1313, 1316–17 (10th Cir. 2014)).  We review de novo both the district court's determination as to the scope of the alleged conspiracy, and its decision to grant the Motion to Dismiss based on the statute of limitations.  See id., 451 F.3d at 1218 (internal citations omitted).

The operative question here, then, is whether, on the face of the indictment we can conclude that no overt acts in furtherance of the scope of the alleged conspiracy

7

occurred after August 17, 2011.[1]  In granting the Motion to Dismiss, the district court concluded that the purpose of the alleged conspiracy ended in 2008 "when the [agreement was] terminated and all that remained were administrative issues related to resolving the estates and payments resulting therefrom."  Dist. Ct. Order at 4.  In reaching this conclusion, the court relied on language from the indictment stating the purpose of the conspiracy was "to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States."  Id. (quoting the Indictment ¶ 9).  In the district court's eyes, this meant that "any conspiratorial agreement ceased to exist once the allocation of customers through the [agreement] ceased."  Id. at 4.

In so holding, the district court rejected the Government's argument that one object of the conspiracy was "economic enrichment."  Id. at 5.  This theory, according to the court, "confuses the results of a conspiracy with the actual conduct in furtherance of it[,]" id., and if adopted would extend the statute of limitations "indefinitely[,] beyond the period when the unique threats to society posed by a conspiracy are present."  Id. (quoting United States v. Doherty, 867 F.2d 47, 62 (1st Cir. 1989)).

We do not agree, however, that the indictment precludes the argument that economic enrichment was an object of the agreement.  The obvious reason that two firms would suppress and eliminate competition by agreeing to allocate customers would be to reap the economic benefits of such efficiency.  See Indictment ¶ 9.  The

---

[1] Five years prior to the indictment's date of August 17, 2016.

alleged customer allocation was not an end unto itself, but rather a means to reducing overhead and increasing profit, particularly by giving the conspirators power to charge higher contingency fees unhindered by the competition that allegedly ensues when two Heir Location Services firms contact the same heir.  See id. ¶ 7.

Despite Defendants' assertions to the contrary, Evans controls the outcome of this appeal.  In holding that the conspiracy there continued so long as the firms received payments on the unlawfully obtained contracts, we adopted the Eighth Circuit's holding that a "Sherman Act violation [is] 'accomplished both by the submission of noncompetitive bids, *and* by the request for and receipt of payments at anti-competitive levels.'"  Evans, 839 F.2d at 661 (quoting United States v. N. Improvement Co., 814 F.2d 540, 543 n.2 (8th Cir. 1987)).

That is exactly what the indictment alleges occurred here.  Just as multiple companies in Evans decided which would receive a government contract, here the co-conspirators allegedly decided which would receive the business of unallocated heirs. And similarly to how the conspiracy in Evans continued so long as the "winner" of the rigged contract received payments on that contract, so too did the alleged conspiracy continue here so long as the co-conspirators were receiving and distributing contingency fees among the conspirators on the allocated estates. Because Defendants acknowledge that "ordinary, lawful payments made and

administrative tasks undertaken as a *result* of a prior agreement" occurred within the limitations window, the indictment was not time-barred.  See Aple. Br. at 23.[2]

Defendants' attempts to distinguish Evans are unpersuasive.  Their position amounts to the *ipse dixit* that while the "*central* objective" of the agreement in Evans was the distribution of the proceeds earned from the rigged contract, "the 'societal danger' targeted by the Indictment [here] was the 'suppress[ion] and eliminat[ion] [of] competition by agreeing to allocate customers of Heir Location Services."  Aple. Br. at 24–25 (quoting Indictment ¶ 9).  The missing link in this syllogism is that this elimination of competition allows for the Defendants to charge higher contingency fees unencumbered by a competitive bidding process.

Furthermore, the Indictment alleges on its face that as part of the unlawful agreement the companies agreed "that the co-conspirator company to which heirs were allocated would pay to the other co-conspirator company a portion of the contingency fees ultimately collected from those allocated heirs."  Indictment ¶ 11(c).  The Indictment further alleges that these payments between the companies actually occurred.  Id. ¶ 11(f).

When the two firms distributed money amongst each other pursuant to the terms of the alleged agreement after 2011, they committed overt acts in furtherance

---

[2] Both the district court and Defendants explain how holding this indictment time-barred accomplishes the purposes of the statute of limitations because of the amount of time it can take to unwind an estate and disburse its assets.  Dist. Ct. Order at 6; Aple. Br. at 16–17, 27–28.  Perhaps this is correct as a policy matter, although we take no position on that question, but it does nothing to distinguish the on-point authority offered by Evans.

of the alleged conspiracy within the limitations period.  Regardless of how narrow one wants to define the scope of the alleged conspiracy, that scope would certainly include the distribution of funds acquired by one firm pursuant to a non-competitive process and distributed to the other in exchange for not having submitted a bid for the estate in question.

Accordingly, the August 17, 2016, indictment was not barred by the statute of limitations.  The district court order dismissing the Indictment on statute of limitations grounds is REVERSED.

## B. *Jurisdiction over the Rule-of-Reason Order*

We next turn to the district court's rule of reason order.  While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has "repeated time and again that § 1 'outlaw[s] only unreasonable restraints'" of trade.  Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007).  In general, we assess whether a given restraint is unreasonable using the "rule of reason." Id.  "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).  In particular, under the rule of reason, the defendant is permitted to introduce any evidence of the alleged restraint's salutary effect on competition and commerce.  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).

Notwithstanding this general rule, there are "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming

11

virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. Ry. Co., v. United States, 356 U.S. 1, 5 (1958). This approach is known as the "per se" approach. "Under a per se rule, [the government] prevail[s] simply by proving that a particular contract or business arrangement . . . exists; no further market analysis is necessary, and defendants may not present any defenses." In re: Cox Enters., Inc., 871 F.3d 1093, 1097 (10th Cir. 2017). The per se rule is not a different cause of action than the rule of reason, but rather only an evidentiary shortcut through the rule of reason morass. Arizona v. Maricopa Cty. Med. Soc'y., 457 U.S. 332, 344 (1982). It reflects the recognition that some practices will nearly always invite condemnation under the rule of reason, and in those cases the per se rule is appropriate because "for the sake of business certainty and litigation efficiency we . . . tolerate[] the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable." Id.

"Per se liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (quoting Nat. Soc. of Prof. Eng'rs v. United States, 435 U.S. 679, 692 (1978)). The Supreme Court has further clarified that "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." United States v. Topco Assocs., Inc., 405 U.S. 596, 607–08 (1972). But in assessing whether the judicial system has enough "experience" to determine the

12

anticompetitive effects of an action we focus on the particular <u>practice</u> involved, rather than the <u>industry</u> in which the allegedly unlawful practice was used. See <u>Maricopa Cty. Med. Soc'y</u>, 457 U.S. at 351 ("[T]he argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable[.]") (internal quotations omitted).

It is undisputed that "an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a per se violation of § 1 of the Sherman Act." <u>United States v. Suntar Roofing, Inc.</u>, 897 F.2d 469, 473 (10th Cir. 1990); <u>see also</u> <u>Topco</u>, 405 U.S. at 608 ("One of the classic examples of a per se violation of § 1 is an agreement between competitors . . . to allocate territories in order to minimize competition."). The Indictment describes the conduct at issue to do just that: a conspiracy "to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States." Indictment ¶ 9.

The district court here concluded that, notwithstanding the labels used by the government in the Indictment, the per se rule did not apply to the conduct alleged in this case. The court based its ruling on the facts that the alleged agreement was (1) "structured in an unusual way," (2) "affected a small number of estates," and (3)

13

"occurred in a relatively obscure industry (heir location services) with an unusual manner of operation." Aplt. App. at 135. Ultimately, the court concluded that because the agreement applied "only where two firms had already invested significant resources investigating the same estate," and "provided for firms to integrate their efforts going forward, specifically in administering the probate process of the estate, which needed to be done only once," the agreement "on [its] face would not necessarily restrict competition or decrease output, but instead contained efficiency-enhancing potential." Id. at 135. The Government contends this was error under our precedents, specifically Suntar, 897 F.2d at 476 and Topco, 405 U.S. 601.

Before we can assess this issue, however, we must first satisfy ourselves that we have appellate jurisdiction to review this order. In criminal cases, the government is denied the right of appeal absent express statutory authority to do so, United States v. Hines, 419 F.2d 173, 174 (10th Cir. 1969), and under current law the full extent of the government's statutory authority is measured by 18 U.S.C. § 3731, United States v. Forcellati, 610 F.2d 25, 28 (1st Cir. 1979).

Relevant to this case, that section authorizes the government to appeal "from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment . . . except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." 18 U.S.C. § 3731.[3] The statute further provides that

---

[3] While not relevant to this appeal, the government is also authorized to appeal from an order "suppressing or excluding evidence or requiring the return of seized

14

"the provisions of this section shall be liberally construed to effectuate its purposes."

Id.

With an eye toward liberal construction, we have held that some orders having the practical effect of dismissing an indictment, even if they do not formally do so, are appealable pursuant to § 3731. See, e.g., United States v. Bergman, 746 F.3d 1128, 1131 (10th Cir. 2014) ("[D]istrict court actions and orders, bearing the practical effect of dismissing an indictment are subject to appeal under § 3731 even if they do not formally 'dismiss' an indictment or happen to be labeled that way."). The Government argues this is such a case. We are not so persuaded.

The key difference between Bergman and the present case is in the conclusiveness of the connection between the relevant orders and the "practical effect" of dismissal. In Bergman, the order appealed was one "denying a new trial date" after the government's previous conviction of a defendant had been reversed. 746 F.3d at 1130. In construing this order refusing to set a new trial date as akin to a dismissal, we read the order as a dismissal—after all the district court had declared that the matter "shall remain closed." In effect, the court, in its order, had foreclosed the possibility of a new trial.

In the case before us, the sole charge in the Indictment, a criminal conspiracy in violation of § 1 of the Sherman Act, remains actionable and immediately triable following the district court's order. Unlike in Bergman, the Government here may

property[,]"an order adjusting the confinement status of a person charged with, or convicted of, a crime, 18 U.S.C. § 3731, and from the imposition of a sentence, 18 U.S.C. § 3742(b).

15

have the case set for trial. The only effect of the order is to foreclose the Government's <u>preferred</u> avenue for trying the case, instead requiring the Government to prove its case under the rule of reason. This preference, even when strongly held, does not rise to the level of being "tantamount" to dismissal in the same way the order in <u>Bergman</u> foreclosed the possibility of ever presenting the charges to a jury. See <u>Bergman</u>, 746 F.3d at 1131.

Practically, the Government's preference to proceed under a per se rule is not just strongly held, it is a matter of institutional decree. The current version of the United States Attorney's Antitrust Manual states that "current [Antitrust] Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements[.]" U.S. Dep't of Justice, Antitrust Div., Antitrust Division Manual, at III-12 (5th Ed. 2018). And the Government indicated before the district court that "[t]he United States has long eschewed prosecuting conduct subject to the rule of reason, and it has no interest in doing so here." Aplt. App. at 249.

But, as the Government itself acknowledges, that is simply a matter of prosecutorial discretion. That the Government avers it will not proceed with an action given a preliminary order about how the case may proceed—regardless how sincere that averment is—does not mean dismissal is a "necessary result" of the targeted order. See <u>Carroll v. United States</u>, 354 U.S. 394, 405 (1957).[4] Here there

---

[4] <u>Carroll</u> dealt with an adverse suppression ruling. Today, unlike in 1957, adverse suppression rulings are specifically appealable. See 18 U.S.C. § 3731.

16

is nothing stopping the government from proceeding to trial beyond the exercise of its institutional discretion.

United States v. Lavallee, 61 F. App'x 631, 632 (10th Cir. 2003) (per curiam) (unpublished) is persuasive, although admittedly not controlling. There the government moved for a continuance so that its "primary witness" would have the opportunity to "physically recover enough to testify." Id. After the district court denied the continuance, a panel of this court denied the interlocutory appeal, reasoning that the district court's order did not have the "practical effect" of excluding the witness's testimony because "it was not the district court who precluded the witness from testifying. Instead, outside circumstances prevented the witness from attending trial or completing his deposition, and the district court simply refus[ed] to delay the trial." Id. Similarly, here, the district court's order did not have the necessary and equivalent effect of dismissing the indictment, but rather it simply placed the Government in a scenario in which it would prefer not to litigate. That is not tantamount to dismissal under the Bergman rule. See also United States v. Stipe, 653 F.2d 446, 449–50 (10th Cir. 1981) (holding government could not appeal district court's ruling on order of proof even though government averred the ruling prejudiced its ability to prove its case at trial).

The Government's last volley is that its allegation of a per se violation is a "discrete theory of liability," and that the dismissal of such a theory is appealable under § 3731. Aplt. Br. at 50; Reply Br. 29–30. But as the Supreme Court has noted, "per se and rule-of-reason analysis are but two methods of determining whether a

17

restraint is 'unreasonable,' *i.e.*, whether its anticompetitive effects outweigh its procompetitive effects." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990). They could not have been charged as separate counts even if the government had been so inclined.[5] This alone thwarts the government's bid to establish jurisdiction based on United States v. Schneider, 594 F.3d 1219, 1226 (10th Cir. 2010).[6]

We are sympathetic to the Government's position. Based on its longstanding practice of not pursuing criminal antitrust prosecutions under a rule of reason analysis, this order may have the practical effect of dismissing this case unless the government chooses to depart from its position of declining to prosecute this release under a rule of reason approach.

But government appeals of interlocutory orders in criminal cases often tread into thorny constitutional areas. For this reason one leading treatise cautions that interlocutory appeals from non-final decisions "will remain rare in light of the generally strict enforcement of the perception that the policies of finality weigh with

---

[5] The Government argues that this "could have been charged separately" rule is not the test, relying on a case from the First Circuit. Reply Br. at 29–30 (citing United States v. Levasseur, 846 F.2d 786, 790 (1st Cir. 1988)). But the Government does not cite, nor were we able to find, a single case where the Supreme Court or the Tenth Circuit has accepted jurisdiction over an order dismissing conduct that was not, nor could have been, charged separately.

[6] United States v. Terry, 5 F.3d 874 (5th Cir. 1993) is persuasive. There the district court struck from the indictment two alleged "overt acts" the government planned to use to establish conspiracy. 5 F.3d at 875–76. Our sister circuit concluded that even though this ruling hindered the government's methods of proof at trial, it did not fall within the confines of appealable orders established by 18 U.S.C. § 3731. Terry, 5 F.3d at 876.

special force against allowing interlocutory appeals by the government in criminal cases." 15B Charles Alan Wright, Arthur P. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 3919.4, at 636–37 (2d ed. 2018).

Accordingly, we hold that the district court's rule of reason order does not fall within our interlocutory appellate jurisdiction to review.

## C. Mandamus over the Rule of Reason Order

Cognizant that we might so hold, the Government asks us to interpret its brief, in the alternative, as a petition for a writ of mandamus. At the outset we note that a writ of mandamus is an "extraordinary remedy," and is "not a substitute for an appeal." In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1186 (10th Cir. 2009). In recognition of these principles, "we will grant a writ only when the district court has 'acted wholly without jurisdiction or so clearly abused its discretion as to constitute a usurpation of power.'" Id. (quoting United States v. Carrigan, 804 F.2d 599, 602 (10th Cir. 1986)). In determining whether the writ should issue, we have alternated between two similar but distinct frameworks for analysis. The first involves analyzing three "conditions." Id. at 1187. First, "the party seeking issuance of the writ must have no other adequate means to attain the relief he desires[.]" Id. Second, "the petitioner must demonstrate that his right to the writ is clear and indistinguishable[.]" Id. (Internal quotation marks omitted.) Finally, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." Id.

19

The second approach we have used involves five "nonconclusive guidelines."

Id.

> (1) whether the party has alternative means to secure relief; (2) whether the party will be damaged in a way not correctable on appeal; (3) whether the district court's order constitutes an abuse of discretion; (4) whether the order represents an often repeated error and manifests a persistent disregard of federal rules; and (5) whether the order raises new and important problems or issues of law of the first impression.

In re Qwest Commc'ns, 450 F.3d 1179, 1184 (10th Cir. 2006) (internal quotation marks omitted).

While we may have used both approaches in isolation in the past, they unfold similarly in practice. Furthermore, they are best understood as providing an analytical framework which guides our assessment of whether a given case calls for the extraordinary remedy of a writ of mandamus.

Turning to the first "condition," from In re Cooper, which largely tracks the first two guidelines from In re Qwest, we are persuaded that the Government has no further grounds for relief. First and foremost, the Government has represented both to us and to the district court that it intends to follow the guidance contained in the U.S. Attorney's Antitrust Manual which instructs that antitrust prosecution of claims such as this one is only appropriate when the alleged restraint is governed by the per se rule.

The other mandamus conditions and guidelines, however, do not militate so cleanly in favor of issuing the writ. Under In re Cooper, the petitioner's right to the writ must be "clear and indisputable." 568 F.3d at 1187; see also In re Qwest, 450

20

F.3d at 1184 (listing third guideline as whether "the district court's order constitutes an abuse of discretion").

To be sure, were the merits of the rule of reason order before us we might very well reach a different conclusion than did the district court. After all, "an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a per se violation of § 1 of the Sherman Act," Suntar Roofing, Inc., 897 F.2d at 473 (10th Cir. 1990), and Defendants' efforts to distinguish their agreement from a traditional customer allocation agreement are mostly unpersuasive. Despite Defendants' arguments otherwise, it is immaterial whether a customer allocation agreement applies to new or existing customers, Palmer v. RBG of Georgia, Inc., 498 U.S. 46, 49–50 (1990), and there is no rule that allocation agreements are only subject to the per se rule if customers are divided geographically, see United States v. Cadillac Overall Supply Co., 568 F.2d 1078, 1088 (5th Cir. 1978). Nor does it matter that the alleged agreement would only affect a small number of potential customers, cf. United States v. Reicher, 983 F.2d 168, 170 (10th Cir. 1992) (holding that a conspiracy to rig a single bid, and therefore affect only a single customer, is subject to per se analysis), and any lack of judicial familiarity with the Heir Location Services industry is largely irrelevant, Arizona v. Maricopa Cty. Med. Soc'y, 457 U.S. 332, 346 (1982).

Nor does the Heir Location Services industry appear to be as *sui generis* as Defendants would have us believe. The gravamen of the indictment is that prior to the agreement an heir could be contacted by two companies, who would then

21

compete for the heir's business by offering lower contingency fees. After the agreement, the companies would no longer have to compete for these heirs, thereby erasing the incentive to reduce their fees. It seems, then, that this is largely indistinguishable from a traditional customer allocation agreement, which can and does appear in many iterations custom tailored to the industry involved. See Topco, 405 U.S. at 608 (describing customer allocation agreement as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition").

Defendants argue that this particular agreement should be reversed under a rule of reason analysis because it is a market inefficiency to have two firms chasing after the same customers, and the agreement ostensibly incentivizes companies to look for new lines of heirs rather than fighting over a shrinking pie. But Supreme Court jurisprudence is clear: where the per se rule applies, it is of no consequence that an agreement could potentially bring net economic benefits to some part of the market—here to the alleged conspirators. The per se rule recognizes that "[f[or the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable." Maricopa Cty. Med. Svcs., 457 U.S. at 344.

But even if the district court's ruling holding otherwise was in error, it does not seem to be the gross "abuse of discretion" contemplated by In re Qwest, 450 F.3d at 1184, nor the "clear and indisputable" error called for by In re Cooper, 568 F.3d at 1187 required to support a mandamus order from us. A writ of mandamus is not

22

license to ignore the bounds of our appellate jurisdiction simply because we might disagree with the reasoned approach of our district court colleagues.

Finally, the fourth and fifth In re Quest mandamus guidelines ask whether the order represents a repeated error, or whether it raises new and important questions of first impression. 450 F.3d at 1184. Neither applies in this instance. The government has not been able to draw our attention to other instances of this error occurring in legally comparable sanctions, and we do not contemplate a sudden surge of litigation concerning the antitrust status of Heir Location Services firms.

All told, we cannot conclude that mandamus is appropriate under these circumstances. See In re Cooper, 568 F.3d at 1187. Were we to hold otherwise, our circuit could expect a flood of mandamus petitions, and our case would soon be cited for the proposition that the jurisdictional boundaries created by 18 U.S.C. § 3731 are easily eluded through the use of mandamus. Thus, to grant the requested mandamus relief here seems not only to be without legal support, it also would be poor policy.

Perhaps on remand the district court will reconsider its rule of reason order. After all, the parties' dispute before this court has allowed this issue to be more fully explored and assessed.[7] We are acutely aware that we write with the benefit of

---

[7] Cf. Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment[.]"); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge.").

detailed briefing and abundant time, while the district court here was incentivized to rule from the bench on this complicated issue.

The order defendants drafted that was ultimately adopted by the district court first reasons that the per se rule is inapplicable because the agreement was "structured in an unusual way" in that it only applied to new customers. On remand, the district court should consider Palmer, 498 U.S. at 49 (holding it error to conclude that "an allocation of markets or submarkets by competitors is not unlawful unless the market in which the two previously competed is divided between them") (emphasis added) and Topco, 405 U.S. at 608. Second, Defendants' drafted order attempted to distinguish this agreement because it "affected a small number of estates." Aplt. App. at 135. On remand, the district court should consider United States v. Reicher, 983 F.2d 168, 170 (10th Cir. 1992). Finally, the proposed order reasons that the Heir Location Services industry is a "relatively obscure industry" with "an unusual manner of operation." Aplt. App. at 135. On remand, the court should consider Maricopa Cty. Med. Soc'y, 457 U.S. at 346 (the focus is on the particular practice involved—here, customer allocation agreements—not on the industry in which the allegedly unlawful practice was used.).

For these reasons, given the further exposition of these issues that occurred in front of this Court, it is possible the district court may decide to reassess its rule of reason order on remand. However, because we do not have jurisdiction over the order and because we do not believe the case presents issues appropriate for

24

mandamus, we DISMISS the government's appeal of the district court's rule of reason order.

## III.  CONCLUSION

When our founders set out to establish the coordinate branches of government they took pains to establish limits on each.

Here, the district court's order dismissing the indictment as outside the statute of limitations clearly falls within the ambit of our authority.  Because overt acts in furtherance of the alleged conspiracy occurred within the statutory period, we find that dismissal was inappropriate.  But we are powerless, even if we were to conclude it appropriate, to offer relief from the district court order declining to allow the government to pursue this antitrust indictment under a per se approach.  Accordingly we REVERSE the order dismissing the indictment, DISMISS the appeal regarding the rule of reason order for lack of appellate jurisdiction, and REMAND for further proceedings consistent with this opinion.